1  **FITZGERALD MONROE FLYNN PC**
2  JACK FITZGERALD (SBN 257370)
   *jfitzgerald@fmfpc.com*
3  MELANIE R. MONROE (SBN 275423)
   *mmonroe@fmfpc.com*
4  TREVOR FLYNN (SBN 253362)
   *tflynn@fmfpc.com*
5  CAROLINE S. EMHARDT (SBN 321222)
6  *cemhardt@fmfpc.com*
7  2341 Jefferson Street, Suite 200
   San Diego, California 92110
8  Phone: (619) 215-1741
9  **Counsel for Plaintiffs**

10

11              **UNITED STATES DISTRICT COURT**
12              **SOUTHERN DISTRICT OF CALIFORNIA**

13

14                                    | Case No: **'24 CV 0565 BEN VET**
15                                    |
                                      | CLASS ACTION
16  ANN ELDERS and REBECCA            |
17  CRAMPTON, on behalf of themselves, all | **COMPLAINT FOR:**
    others similarly situated, and the general |
18  public,                           | **VIOLATIONS OF CAL. BUS. &**
                                      | **PROF. CODE §§17200 et seq.; CAL.**
19                                    | **BUS. & PROF. CODE §§17500 et seq.;**
20              Plaintiffs,           | **and CAL. CIV. CODE §§ 1750 et seq.;**
21          v.                        | **BREACH OF EXPRESS & IMPLIED**
                                      | **WARRANTIES;**
22  OCEAN SPRAY CRANBERRIES, INC.,    |
23                                    | **NEGLIGENT AND INTENTIONAL**
              Defendant.              | **MISREPRESENTATION; AND**
24
25                                    | **UNJUST ENRICHMENT**
26                                    | DEMAND FOR JURY TRIAL
27

28

*Elders v. Ocean Spray Cranberries, Inc.*
CLASS ACTION COMPLAINT

Plaintiffs Ann Elders and Rebeca Crampton, on behalf of themselves, all others similarly situated, and the general public, by and through their undersigned counsel, bring this action against Defendant Ocean Spray Cranberries, Inc. ("Ocean Spray"), and allege the following upon their own knowledge, or where they lack personal knowledge, upon information and belief, including the investigation of their counsel.

## INTRODUCTION

1.    Ocean Spray sells "Craisins Dried Cranberries" and "Cranberry Bites" ("Craisins" and "Bites" respectively, together, the "Products") that it labels as meeting the United States Department of Agriculture's (USDA) "MyPlate" dietary recommendations, and being "a wholesome snack you can feel good about!" to "satisfy your sweet tooth."





2.    This labeling is false and misleading because the Products contain high amounts of added sugar, the consumption of which increases the risk of, *inter alia*, cardiovascular disease, type 2 diabetes, metabolic disease, and liver disease, and is contrary to authoritative recommendations, including by the USDA.

3.      Because the Products are not healthy, Plaintiffs bring this action on behalf of themselves, similarly-situated Class Members, and the general public to enjoin Ocean Spray from deceptively marketing the Products in this manner and to recover compensation for injured Class Members.

## JURISDICTION & VENUE

4.      This Court has original jurisdiction over this action under 28 U.S.C. § 1332(d)(2) (The Class Action Fairness Act) because the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, and at least one member of the class of plaintiffs is a citizen of a state different from Ocean Spray. In addition, more than two-thirds of the members of the class reside in states other than the state in which Ocean Spray is a citizen and in which this case is filed, and therefore any exceptions to jurisdiction under 28 U.S.C. § 1332(d) do not apply.

5.      The Court has personal jurisdiction over Ocean Spray because it has purposely availed itself of the benefits and privileges of conducting business activities within California, including by distributing and selling the Products in California.

6.      Venue is proper in this Southern District of California pursuant to 28 U.S.C. § 1391(b) and (c), because Defendant resides (*i.e.*, is subject to personal jurisdiction) in this district, and because a substantial part of the events or omissions giving rise to the claims occurred in this district.

## PARTIES

7.      Plaintiff Ann Elders presently resides and intends to continue to reside in San Diego County, California. Accordingly, she is a citizen of California.

8.      Plaintiff Rebecca Crampton presently resides and intends to continue to reside in San Diego County, California. Accordingly, she is a citizen of California.

9.      Defendant Ocean Spray Cranberries, Inc. is incorporated in Massachusetts and has its principal place of business in Lakeville, Massachusetts.

## FACTS

### I. OCEAN SPRAY LABELS THE PRODUCTS AS HEALTHY

10. During at least the four years preceding the filing of this Complaint and continuing today, Ocean Spray has sold the Products on a nationwide basis, including in California.[1]

#### A. The Products' Labels Convey an Affirmative Health Message

11. Consumers prefer healthy foods and are willing to pay more for—and purchase more often—products marketed and labeled as being healthy.[2]

12. Food companies like Ocean Spray know that nutrition science is complex and that most consumers resort to making inferences to fill the gaps in their knowledge. Ocean Spray also knows that the inferences consumers make will be consistent with the statements and images presented on a label.[3]

13. Aware of this strong consumer preference, Ocean Spray has chosen to market the Products with claims intended to convince consumers the Products are healthy food choices.

14. Specifically, as depicted on the next page, the packaging for Bites says: "a wholesome snack you can feel good about!" to "satisfy your sweet tooth":

---

[1] Bites' packaging may have changed in or around May 2023, but prior packaging may still be available for sale. *See* https://news.oceanspray.com/2023-05-09-Ocean-Spray-and-Hershey-Launch-a-Sweet-New-Partnership.

[2] *See*, *e.g.*, Nancy Gagliardi, "Consumers Want Healthy Foods—And Will Pay More For Them," *Forbes* (Feb. 18, 2015) ("88% of those polled are willing to pay more for healthier foods").

[3] *See*, *e.g.*, Pierre Chandon, *How Package Design and Packaged-based Marketing Claims Lead to Overeating*, APPLIED ECON. PERSPECTIVE AND POLICY, Vol. 35: 7-31 (2013).

3




15.     As depicted on the next page, the packaging for the Craisins states: "1 serving of Craisins® Dried Cranberries meets 25% of your daily recommended fruit needs" and "Each 1/4 cup serving of Craisins® Dried Cranberries provides 1/2 cup of fruit. The USDA My Plate recommends a daily intake of 2 cups of fruit for a 2,000 calorie diet," which is accompanied by the USDA "MyPlate" graphic.





**B.      Ocean Spray Omits Material Information**

16.     The 2020-2025 Dietary Guidelines for Americans,[4] on which the USDA "MyPlate" recommendations are based, state:

---

[4] U.S. Dep't of Health & Human Servs. and U.S. Dept. of Agric., "Dietary Guidelines for Americans 2020 – 2025" (8th ed.), *available at* https://www.dietaryguidelines.gov/sites/default/files/2020-12/Dietary_Guidelines_for_Americans_2020-2025.pdf [hereinafter "2020-2025 DGA"].

5

a.     "Nutrient-dense foods and beverages provide vitamins, minerals, and other health-promoting components **and have little added sugars** . . . . [F]ruits . . . **when prepared with no or little added sugars** . . . are nutrient-dense foods" (emphasis added);

b.     "Choose foods and beverages with less added sugars";

c.     "An underlying premise of the *Dietary Guidelines* is that nutritional needs should be met primarily from foods and beverages—specifically, nutrient-dense foods and beverages. Nutrient-dense foods . . . have no or little added sugars";

d.     "Limit foods and beverages higher in added sugars";

e.     "The *Dietary Guidelines* include recommendations for food groups—vegetables, fruits, grains, dairy, and protein foods—eaten . . . in forms with limited amounts of added sugars."

17.    Ocean Spray omits this material information from Craisins packaging because it is unfavorable, setting forth instead only favorable content from the USDA "MyPlate" recommendations, which Ocean Spray takes out of context.

18.    Thus, while representing that the Craisins are healthy, Ocean Spray intentionally omits material information regarding the countervailing detrimental effects of the added sugar in Craisins.

19.    More generally, Ocean Spray's website touts its "wide variety of foods and beverages that can help add cranberry benefits to people's diets,"[5] omitting any reference to the harms to people's diets from consuming the added sugar in those foods and beverages:

---

[5] *See* https://www.oceanspray.com/Health.

*Elders v. Ocean Spray Cranberries, Inc.*
CLASS ACTION COMPLAINT



## II. CONSUMING FOODS HIGH IN ADDED SUGAR IS DETRIMENTAL TO BODILY HEALTH

### A. Added Sugar Consumption Increases Risk of Cardiovascular Heart Disease and Mortality

20. Cardiovascular diseases affect nearly half of American adults.[6]

21. Cardiovascular Heart Disease (CHD) is the leading cause of death for men and women in the United States.[7] Approximately 20 million adults in the United States age twenty and older have coronary artery disease (CAD), which is the most common type of CHD.[8] In

---

[6] American Heart Association News, "Cardiovascular diseases affect nearly half of American adults, statistics show" (Jan. 31, 2019), *available at* https://www.heart.org/en/news/2019/01/31/cardiovascular-diseases-affect-nearly-half-of-american-adults-statistics-show.

[7] Centers for Disease Controls and Prevention, "Heart Disease Facts," https://www.cdc.gov/heartdisease/facts.htm (citing National Center for Health Statistics, *Multiple Cause of Death 2018–2021 on CDC WONDER Database*, https://wonder.cdc.gov/mcd.html) (last reviewed May 15, 2023).

[8] *Id.*

2020, CAD killed more than 380,000 people.[9] Every year, more than 800,000 people in the United States have a heart attack.[10]

22.     Data obtained from National Health and Nutrition Examination surveys (NHANES) demonstrate that adults who consumed 10% - 24.9% of their calories from added sugar had a 30% greater risk of cardiovascular disease (CVD) mortality than those who consumed 5% or less of their calories from added sugar. In addition, those who consumed 25% or more of their calories from added sugar had an average 275% greater risk of CVD mortality than those who consumed less than 5% of calories from added sugar. Thus, "[t]he risk of CVD mortality increased exponentially with increasing usual percentage of calories from added sugar[.]"[11]



Figure 1. Adjusted Hazard Ratio (HR) of the Usual Percentage of Calories From Added Sugar for Cardiovascular Disease Mortality Among US Adults 20 Years or Older: National Health and Nutrition Examination Survey Linked Mortality Files, 1988-2006

Histogram of the distribution of usual percentage of calories from added sugar in the population. Lines show the adjusted HRs from Cox models. Midvalue of quintile 1 (7.4%) was the reference standard. The model was adjusted for age, sex, race/ethnicity, educational attainment, smoking status, alcohol consumption, physical activity level, family history of cardiovascular disease, antihypertensive medication use, Healthy Eating Index score, body mass index, systolic blood pressure, total serum cholesterol, and total calories. Solid line indicates point estimates; dashed lines indicate 95% CIs.

23.     In a study of preschool children published in January 2020, researchers found that higher consumption of added sugar was significantly associated with elevated CMR

---

[9] *Id.*

[10] *Id.*

[11] Quanhe Yang et al., *Added Sugar Intake and Cardiovascular Diseases Mortality Among US Adults*, JAMA INTERN. MED., at E4-5 (Feb. 3, 2014).

(cardiometabolic risk) scores. The researchers stated that their "findings support recommendations to limit overall intake of SCB [sugar-containing beverages] in early childhood, in [an] effort to reduce the potential long-term burden of CMR."[12]

24.    In another prospective cohort study, consumption of added sugar was significantly shown to increase risk of CHD, as well as adverse changes in some blood lipids, inflammatory factors, and leptin.[13]

25.    Added sugar consumption is also associated with several CHD risk factors, such as dyslipidemia,[14] obesity,[15] and increased blood pressure.[16]

**B.    Added Sugar Consumption Increases Risk of Type 2 Diabetes**

26.    Diabetes affects 37.3 million Americans (approximately 1 in 10), and 96 million American adults (more than 1 in 3) have prediabetes.[17] It can cause kidney failure, lower-

---

[12] Karen M. Eny et al., *Sugar-containing beverage consumption and cardiometabolic risk in preschool children*, PREV. MED. REPORTS 17 (Jan. 14, 2020).

[13] Lawrence de Koning et al., *Sweetened beverage consumption, incident coronary heart disease, and biomarkers of risk in men*, CIRCULATION, Vol. 125, pp. 1735-41 (2012).

[14] Sharon S. Elliott et al., *Fructose, weight gain, and the insulin resistance syndrome*, AM. J. CLIN. NUTR., Vol. 76, No. 5, pp. 911-22 (2002).

[15] Myles S. Faith et al., *Fruit juice intake predicts increased adiposity gain in children from low-income families: weight status-by-environment interaction*, PEDIATRICS, Vol. 118 (2006) ("Among children who were initially either at risk for overweight or overweight, increased fruit juice intake was associated with excess adiposity gain, whereas parental offerings of whole fruits were associated with reduced adiposity gain."); Matthias B. Schulze et al., *Sugar-sweetened beverages, weight gain, and incidence of type 2 diabetes in young and middle-aged women*, JAMA, Vol. 292, No. 8, pp. 927-34 (2004) [hereinafter "Schulze, *diabetes in young and middle-aged women*"]; DS Ludwig et al., *Relation between consumption of sugar-sweetened drinks and childhood obesity: a prospective, observational analysis*, LANCET, Vol. 257, pp. 505-508 (2001); B A Dennison et al., *Excess fruit juice consumption by preschool-aged children is associated with short stature and obesity*, PEDIATRICS, Vol. 99, pp. 15-22 (1997).

[16] Erin Hoare et al., *Sugar- and Intense-Sweetened Drinks in Australia: A Systematic Review on Cardiometabolic Risk*, NUTRIENTS, Vol. 9, No. 10 (2017).

[17] *See* https://www.cdc.gov/diabetes/library/spotlights/diabetes-facts-stats.html.

limb amputation, and blindness. In addition, diabetes doubles the risk of colon and pancreatic cancers and is strongly associated with coronary artery disease and Alzheimer's disease.[18]

27.     Globally, countries where sugar consumption is highest have the highest rates of type 2 diabetes, while those with the lowest consumption have the lowest rates.[19] An econometric analysis of repeated cross-sectional data published in 2013, for example, established a causal relationship between sugar availability and type 2 diabetes. After adjusting for a wide range of confounding factors, researchers found that an increase of 150 calories per day related to an insignificant 0.1% rise in diabetes prevalence by country, while an increase of 150 calories per day in sugar related to a 1.1% rise in diabetes prevalence by country, a statistically significant 11-fold difference.[20]

28.     An analysis of data for more than 50,000 women from the Nurses' Health Study,[21] during two 4-year periods (1991-1995 and 1995-1999), showed, after adjusting for confounding factors, that women who consumed 1 or more sugar-sweetened soft drink per day—equivalent to 140-150 calories and 35-37.5 grams of added sugar—had an 83% greater

---

[18] Javier Aranceta Bartrina & Carmen Pérez Rodrigo, *Association between sucrose intake and cancer: a review of the evidence*, NUTR. HOSP., Vol. 28 (Suppl. 4), 95-105 (2013); Custodia García-Jiménez et al., *A new link between diabetes and cancer: enhanced WNT/beta-catenin signaling by high glucose*, J. MOL. ENDOCRINOL., Vol. 52, No. 1 (2014); Gerard J. Linden et al., *All-cause mortality and periodontitis in 60-70-year-old men: a prospective cohort study*, J. CLIN. PERIODONTAL., Vol. 39, No. 1, 940-46 (Oct. 2012).

[19] Praveen Weeratunga et al., *Per capita sugar consumption and prevalence of diabetes mellitus--global and regional associations*, BMC PUB. HEALTH, 2014 (Feb. 20, 2014).

[20] Sanjay Basu et al., *The Relationship of Sugar to Population-Level Diabetes Prevalence: An Econometric Analysis of Repeated Cross-Sectional Data*, PLOS ONLINE, Vol. 8, Issue 2 (Feb. 27, 2013) [hereinafter "Basu, *The Relationship*"].

[21] The Nurses' Health Study was established at Harvard in 1976, and the Nurses' Health Study II, in 1989. Both are long-term epidemiological studies conducted on women's health. The study followed 121,700 female registered nurses since 1976, and 116,000 female nurses since 1989, to assess risk factors for cancer, diabetes, and cardiovascular disease. The Nurses' Health Studies are among the largest investigations into risk factors for major chronic disease in women ever conducted. *See generally* "The Nurses' Health Study," *at* http://www.channing.harvard.edu/nhs.

relative risk of type 2 diabetes compared with those who consumed less than 1 such beverage per month.[22]

29.     The link between sugar intake and diabetes still holds even after controlling for total calorie intake, body weight, alcohol consumption and exercise.[23]

**C.     Added Sugar Consumption Increases Risk of Metabolic Disease**

30.     Metabolic syndrome is a group of conditions that together raise the risk of type 2 diabetes, cardiovascular disease, obesity, polycystic ovary syndrome, nonalcoholic fatty liver disease, and chronic kidney disease. Metabolic syndrome is defined as the presence of any three of the following:

a.     Large waist size (35" or more for women, 40" or more for men);

b.     High triglycerides (150mg/dL or higher, or use of cholesterol medication);

c.     High total cholesterol, or HDL levels under 50mg/dL for women, and 40 mg for men;

d.     High blood pressure (135/85 mm or higher); or

e.     High blood sugar (100mg/dL or higher).

31.     More generally, "metabolic abnormalities that are typical of the so-called metabolic syndrome . . . includ[e] insulin resistance, impaired glucose tolerance, high concentrations of circulating triacylglycerols, low concentrations of HDLs, and high concentrations of small, dense LDLs."[24]

32.     About 1 in 3 adults in the United States have metabolic syndrome, placing them at higher risk for chronic disease.[25]

---

[22] Schulze, *diabetes in young & middle-aged women*, *supra* n.15.

[23] Basu, *The Relationship*, *supra* n.20.

[24] Susan K. Fried & Salome P. Rao, *Sugars, hypertriglyceridemia, and cardiovascular disease*, AM. J. CLIN. NUTR., Vol. 78 (suppl.), 873S-80S, at 873S (2003).

[25] *See* https://www.nhlbi.nih.gov/health/metabolic-syndrome (last updated May 18, 2022).

33.    Defining "metabolic health" as having optimal levels of waist circumference (WC <102/88 cm for men/women), glucose (fasting glucose <100 mg/dL and hemoglobin A1c <5.7%), blood pressure (systolic <120 and diastolic <80 mmHg), triglycerides (<150 mg/dL), and high-density lipoprotein cholesterol (≥40/50 mg/dL for men/women), and not taking any related medication, data from the NHANES Survey 2009-2016 showed prevalence of "metabolic health" in American adults is alarmingly low, even in normal weight individuals.[26]

34.    Excess consumption of added sugar leads to metabolic syndrome by stressing and damaging crucial organs, including the pancreas and liver. When the pancreas, which produces insulin, becomes overworked, it can fail to regulate blood sugar properly. Large doses of added sugar can overwhelm the liver, which metabolizes the fructose in the sugar. In the process, the liver will convert excess fructose to fat, which is stored in the liver and released into the bloodstream. This process contributes to key elements of metabolic syndrome, including high blood fats and triglycerides, high cholesterol, high blood pressure, and extra body fat, especially in the belly.[27]

35.    In 2016, researchers conducted a study to determine whether the detrimental effects of dietary sugar were due to extremely high dosing, excess calories, or because of its effects on weight gain, rather than caused by sugar consumption directly.[28] In other words, the researchers dissociated the metabolic effects of dietary sugar from its calories and effects on weight gain.

---

[26] Joana Araújo et al., *Prevalence of Optimal Metabolic Health in American Adults: National Health and Nutrition Examination Survey 2009-2016*, METAB. SYNDR. RELAT. DISORD. (2019).

[27] Lisa Te Morenga et al., *Dietary sugars and body weight: systematic review and meta-analyses of randomized controlled trials and cohort studies*, BJM (2012).

[28] Robert H Lustig et al., *Isocaloric fructose restriction and metabolic improvement in children with obesity and metabolic syndrome*, OBESITY (SILVER SPRING), Vol. 24, No. 2, 453-60 (Feb. 2016).

36.     Because the researchers did not want to *give* subjects sugar to see if they got sick, they instead took sugar away from people who were already sick to see if they got well. But if subjects lost weight, critics would argue that the drop in calories or weight loss was the reason for the clinical improvement. Therefore, the researchers designed the study to be isocaloric, by giving back to subjects the same number of calories in starch that were taken away in sugar. The study involved 43 children, ages 8 to 19, each obese with at least one other co-morbidity demonstrating metabolic problems. All were high consumers of added sugar in their diets.[29]

37.     To perform the study, researchers assessed subjects' home diets by two questionnaires to determine how many calories, and how much fat, protein, and carbohydrate they were eating. Subjects were then tested at a hospital based on their home diets. Then, for the next 9 days, researchers catered the subjects' meals. The macronutrient percentages of fat, protein, and carbohydrate were not changed. Subjects were fed the same calories and percent of each macronutrient as their home diet; but within the carbohydrate fraction, researchers took the added sugar out, and substituted starch. For example, researchers took pastries out, and put bagels in; took yogurt out, and put baked potato chips in; took chicken teriyaki out, and put turkey hot dogs in (although subjects were still given whole fruit). Researchers reduced subjects' dietary sugar consumption from 28% to 10% of calories. Researchers also gave subjects a scale to take home, and each day they would weigh themselves. If they were losing weight, they were instructed to eat more. The goal was for subjects to remain weight-stable over the 10 days of study. On the final day, subjects came back to the hospital for testing on their experimental low-added sugar diet. The study team analyzed the pre- and post-data in a blinded fashion so as not to introduce bias.[30]

38.     Researchers analyzed three types of data. First, diastolic blood pressure decreased by 5 points. Second, baseline blood levels of analytes associated with metabolic

---

[29] *See id.* at 453-54.

[30] *See id.* at 454-55.

disease, such as lipids, liver function tests, and lactate (a measure of metabolic performance) all improved significantly. Third, fasting glucose decreased by 5 points. Glucose tolerance improved markedly, and fasting insulin levels fell by 50%. Each of these results was highly-statistically-significant.[31]

39.   In sum, the study indicated that subjects improved their metabolic status in just 10 days, even while eating processed food, just by removing added sugar and substituting starch. The metabolic improvement, moreover, was unrelated to changes in weight or body fat.

**D.   Added Sugar Consumption Increases Risk of Liver Disease**

40.   Added sugar consumption causes serious liver disease, including non-alcoholic fatty liver disease (NAFLD), characterized by excess fat build-up in the liver. Five percent of these cases develop into non-alcoholic steatohepatitis (NASH), scarring as the liver tries to heal its injuries, which gradually cuts off vital blood flow to the liver. About 25% of NASH patients progress to non-alcoholic liver cirrhosis, which requires a liver transplant or can lead to death.[32]

41.   Since 1980, the incidence of NAFLD and NASH has doubled, along with the rise of fructose consumption, with approximately 6 million Americans estimated to have progressed to NASH and 600,000 to Nash-related cirrhosis. Most people with NASH also have type 2 diabetes. NASH is now the third-leading reason for liver transplant in America.[33]

42.   Moreover, because the liver metabolizes sugar virtually identically to alcohol, the U.S. is now seeing—for the first time—alcohol-related diseases in children. Conservative

---

[31] *See id.* at 455-56.

[32] Geoffrey C. Farrell & Claire Z. Larter, *Nonalcoholic fatty liver disease: from steatosis to cirrhosis*, HEPATOLOGY, Vol. 433, No. 2 (Suppl. 1), S99-S112 (Feb. 2006); EE Powell et al., *The natural history of nonalcoholic steatohepatitis: a follow-up study of forty-two patients for up to 21 years*, HEPATOLOGY, Vol. 11, No. 1 (1990).

[33] Michael C. Charlton et al., *Frequency and outcomes of liver transplantation for nonalcoholic steatohepatitis in the United States*, GASTROENTEROLOGY, Vol. 141, No. 4, 1249-53 (Oct. 2011).

estimates are that 31% of American adults, and 13% of American children suffer from NAFLD.[34]

**E.      Authoritative Bodies Recommend, for Good Health, Excluding or Minimizing Added Sugar Consumption**

43.     The 2020-2025 DGA, discussed above,[35] states that a healthy dietary pattern limits added sugars to less than 10 percent of daily calories, adding that "[w]hen added sugars in foods and beverages exceed 10 percent of calories, a healthy dietary pattern within calories limits is very difficult to achieve."[36]

44.     The Scientific Report of the 2020 Dietary Guidelines Advisory Committee was even stricter than what the USDA and HHS ultimately adopted, "suggest[ing] that **less than 6 percent** of energy from added sugars is more consistent with a dietary pattern that is nutritionally adequate . . . than is a pattern with less than 10 percent energy from added sugars."[37]

45.     The FDA, which previously did not set limits on added sugar for foods labeled "healthy," recently proposed a limit of ≤5 percent of the daily value (and thus ≤2 ½ grams of

---

[34] Sarah M. Lindbäck et al., *Pediatric nonalcoholic fatty liver disease: a comprehensive review*, ADV. PEDIATR., Vol. 57, No. 1, 85-140 (2010); Mariana Lazo & Jeanna M Clark, *The epidemiology of nonalcoholic fatty liver disease: a global perspective*, SEMIN. LIVER DIS., Vol. 28, No. 4, 339-50 (2008); Jeffrey B Schwimmer et al., *Prevalence of Fatty Liver in Children and Adolescents*, PEDIATRICS, Vol. 118, No. 4, 1388-93 (2006); Jeffrey D Browning et al., *Prevalence of hepatic steatosis in an urban population in the United States: impact of ethnicity*, HEPATOLOGY, Vol. 40, No. 6, 1387-95 (2004).

[35] *See supra* ¶ 16.

[36] *See* 2020-2025 DGA, *supra* n.4 at 41.

[37] USDA, "Scientific Report of the 2020 Dietary Guidelines Advisory Committee" (2020), Part A, p. 11 (emphasis added); *see also* Hope Warshaw & Steven V. Edelman, *Practical Strategies to Help Reduce Added Sugars Consumption to Support Glycemic and Weight Management Goals*, CLIN. DIABETES, Vol. 39,1 at 45-56 (Jan. 2021).

added sugar for adults and children ages 4 and older) for making such claims.[38] The proposal passed in fall 2023 and will begin implementation in April 2024.[39] According to FDA:

> [T]he [prior] definition permit[ted] manufacturers to use the claim "healthy" on some foods that, based on the most up-to-date nutrition science and Federal dietary guidance, contain levels of nutrients that would not help consumers maintain healthy dietary practices (*e.g.*, [foods] that may be high in added sugars). Thus . . . the "healthy" claim definition need[ed] to be updated in order to ensure that products bearing the claim are the products that may help consumers maintain healthy dietary practices, consistent with current nutrition science and Federal dietary guidance.[40]

46.    FDA describes the update as "a step towards providing the public with information that can help them identify food choices that can help lead to reducing diet-related chronic diseases."[41]

47.    The World Health Organization (WHO) recommends that no more than 10% of an adult's calories, and ideally less than 5%, come from free or added sugar.[42]

48.    The American Heart Association (AHA) recommends restricting added sugar to 5% of calories.[43]

---

[38] Food Labeling: Nutrient Content Claims; Definition of Term "Healthy," 87 Fed. Reg. 59168, 59180 (Sept. 29, 2022) (to be codified at 10 C.F.R. § 101.65), *available at* https://www.govinfo.gov/content/pkg/FR-2022-09-29/pdf/2022-20975.pdf; *see also* Food Labeling: Nutrient Content Claims; Definition of Term "Healthy," Extension of Comment Period, 87 Fed. Reg. 73267 (Nov. 29, 2022).

[39] https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202310&RIN=0910-AI13.

[40] *See* 87 Fed. Reg. at 59170, 59173.

[41] *See* https://www.fda.gov/consumers/consumer-updates/fresh-take-what-healthy-means-food-packages (current as of Nov. 28, 2022).

[42] World Health Organization, "Healthy Diet," *available at* https://www.who.int/news-room/fact-sheets/detail/healthy-diet.

[43] Rachel K. Johnson et al., *Dietary sugars intake and cardiovascular health: a scientific statement from the American Heart Association*, CIRCULATION, Vol. 120, 1011-20, at 1016-17 (2009).

16

49.     The Centers for Disease Control and Prevention (CDC) warns that "[t]oo much sugar in your diet can lead to health problems such as weight gain and obesity, type 2 diabetes, and heart disease."[44]

50.     The National Kidney Foundation explains "added sugars don't add anything but empty calories, so . . . there's no extra nutritional benefit to consuming these sugars." Sugar "may be a key factor contributing to our national obesity epidemic" because "the average American consumes almost 152 pounds of sugar each year, which breaks down to almost 3 pounds . . . of sugar each week."[45]

51.     The American Diabetes Association says "[r]egardless of what cuisine you prefer, . . . all healthy eating plans . . . include . . . less added sugar."[46] It clarifies fruit can "help you satisfy your sweet tooth **without the added sugar**."[47]

52.     The National Cancer Institute, reflecting on the scientific evidence, explains "dietary patterns that included higher intake of added sugars were associated with an increased risk of cardiovascular disease, cancers, and other negative health outcomes."[48]

53.     The Harvard School of Public Health points out that "the Healthy Eating Plate does not include foods with added sugars."[49]

---

[44] Centers for Disease Control and Prevention, "Know Your Limit for Added Sugars," https://www.cdc.gov/healthyweight/healthy_eating/sugar.html.

[45] National Kidney Foundation, "5 Sneaky Sources of Sugar," *Kidney.org*, https://www.kidney.org/atoz/content/5_Sneaky_Sources_of_Sugar (last accessed Mar. 7, 2024).

[46] American Diabetes Association, "Tips for Eating Well," *Diabetes.org*, https://diabetes.org/food-nutrition/eating-healthy (last accessed Mar. 7, 2024).

[47] *Id.* (emphasis added).

[48] National Cancer Institute, "Updated Nutrition Facts Label Reflects Science on Diet and Health, Including Cancer," *cancer.gov* (May 19, 2020), https://www.cancer.gov/news-events/cancer-currents-blog/2020/nutrition-facts-label-updated-fda-nci.

[49] Harvard T.H. Chan School of Public Health, "Added Sugar," The Nutrition Source, *available at* https://www.hsph.harvard.edu/nutritionsource/carbohydrates/added-sugar-in-the-diet (last reviewed Apr. 2022).

## III.   THE PRODUCTS' HEALTH AND WELLNESS REPRESENTATIONS AND OMISSIONS ARE LIKELY TO MISLEAD REASONABLE CONSUMERS

54.   Bites contain 16-18 grams of added sugar per serving, contributing approximately 50% of their calories.[50] Craisins contain more than 20 grams of added sugar, contributing up to 80% of their calories.[51] Even the Craisins "50% Less Sugar" variety gets 32% of its calories from added sugar, more than triple the 2020-2025 DGA recommendation for a healthy dietary pattern, and six times the amount the FDA recognizes as a "healthy" food.

55.   As a result, a single serving of most Craisins flavors contains 26g added sugar— more than 200% of the daily limit for young children, approximately 100% of the daily limit for older children and adult women, and approximately 70% of the daily limit for adult men.

56.   Similarly, a single serving of Bites, depending on the flavor (16g or 18g added sugar), contains more than 100% of the daily limit for young children, approximately 70% of the daily limit for older children and adult women, and approximately 45% of the daily limit for adult men.

57.   Because the scientific evidence establishes that consuming such high amounts of added sugar is likely to increase risk of cardiovascular disease, type 2 diabetes, metabolic disease, and liver disease—and because the Products contain such high amounts of added sugar—Ocean Spray's health and wellness representations concerning the Products are false and misleading.

---

[50] During the relevant time, Bites were sold in at least two varieties: "Greek Yogurt" and "Milk Chocolate." *See* Appendix 1 (label exemplars). This Complaint, however, should be read to include any additional varieties not yet identified that include the challenged claims.

[51] During the relevant time, Craisins were sold in at least (a) "Original," (b) "Blueberry Juice Infused," (c) "Cherry Juice Infused," (d) "Pomegranate Juice Infused," (e) "Whole & Juicy," (f) "50% Less Sugar," (g) "Orange flavored," (h) "Strawberry flavored," and (i) "Watermelon flavored" varieties. *See* Appendix 1 (label exemplars) This Complaint, however, should be read to include any additional varieties not yet identified that include the challenged claims.

58.     In addition, Ocean Spray is likely to mislead reasonable consumers by taking the USDA information out of context to suggest the Products are healthy, and deceptively omitting the countervailing information in the 2020-2025 DGA regarding the health harms of consuming high added sugar.

59.     Ocean Spray is under a duty to disclose this information to consumers because it is revealing some information about the Products—enough to suggest they are healthy—without revealing material information regarding the harmful effects of added sugar described herein.

60.     Ocean Spray is further under a duty to disclose this information because its deceptive omissions concern human health, specifically the detrimental health effects of consuming the Products.

61.     Ocean Spray is further under a duty to disclose this information because it was in a superior position to know of the dangers presented by the added sugars in the Products, as it is a large, sophisticated company that holds itself out as have expert knowledge regarding the health impact of consuming the Products.

62.     Finally, Ocean Spray is under a duty to disclose this information because, including through the acts alleged herein, it actively concealed material facts not known to Plaintiffs and the Class concerning the detrimental effects of regularly consuming the Products.

63.     Moreover, the disclosure of the gram amount of added sugar in the Products' Nutrition Facts Panels is insufficient to dispel Ocean Spray's misleading health and wellness claims and omissions. Not only are reasonable consumers not expected to inspect that information, but numerous studies demonstrate most consumers cannot make accurate assessments of a food's healthfulness based on the Nutrition Facts Panel, even when they do.

64.     Research shows most consumers do not actually review the sugar content of products, and even those who do are often unable to accurately determine a products' healthfulness. The University of Minnesota's Epidemiology Clinical Research Center simulated a grocery shopping exercise on a computer equipped with an eye-tracking camera

19

and found that, even for the relatively small subset of consumers that claim to "almost always" look at a product's sugar content (24%), *only about 1% actually look beyond the calorie count to other components of the Nutrition Facts panel, such as sugar*.[52] Data from the survey suggests the average consumer reads only the top five lines on a Nutrition Facts label (serving size, calories, total fat, saturated fat, trans fat). Total and added sugar—listed twelfth and thirteenth—follows cholesterol, sodium, total carbohydrate, and dietary fiber, among other things.

65.    A survey of more than one hundred college students examined how those with differing levels of nutrition knowledge interpreted "intrinsic" cues (ingredient list) and "extrinsic" cues, such as an "all natural" labeling claim.[53]  The survey found that while those who had completed an upper-division nutrition course "used central route processing to scrutinize intrinsic cues and make judgments about food products," those who had not completed an upper-division nutrition course "did the opposite," relying on extrinsic cues.[54] The average consumer will thus more likely rely on labeling claims than the ingredient list or Nutrition Facts Box, to make a judgment about whether a food is healthy.

66.    Moreover, "mandated nutrition labels have been criticized for being too complex for many consumers to understand and use."[55] "Using NFP labels requires not only being able to read and perform arithmetic but also—just as importantly—the ability to reason with

---

[52] Dan J. Graham & Robert W. Jeffery, *Location, location, location: eye-tracking evidence that consumers preferentially view prominently positioned nutrition information*, J. AM. DIET. ASSOC. (2011) (emphasis added).

[53] Amber Walters et al., *The effect of food label cues on perceptions of quality and purchase intentions among high-involvement consumers with varying levels of nutrition knowledge*, J. NUTR. EDUC. BEHAV. 44(4): 350-54 (2012).

[54] *Id.*

[55] Alexander Persoskie et al., *US Consumers' Understanding of Nutrition Labels in 2013: The Importance of Health Literacy*, PREV. CHRONIC DIS. 14;170066 (2017) [hereinafter "Persoskie et al., *US Consumers' Understanding*"].

words and numbers. According[ly], a substantial proportion of consumers clearly struggle to effectively use the information contained in a nutrition label."[56]

67.    One survey found "[s]ubjects were not very good at using the [nutrition] label to make mathematical calculations, evaluate false claims, or draw dietary implications about a product," and "[r]esearch has consistently found that consumers have difficulty using label information if the task requires math."[57] Accordingly, the authors concluded the nutrition label is "an inadequate tool for helping people to plan diets" and "unlikely to contribute by itself to a better or more critical understanding of nutrition principles."[58] In sum, the "mathematical skills of the American population present a significant barrier to following dietary recommendations based on quantitative tasks."[59]

68.    Consumers' inability to effectively use the nutrition label is particularly problematic in light of their tendency to rely heavily on symbolic cues of healthfulness. For example, in a survey of 164 consumers, participants were asked to evaluate the healthiness of two breakfast cereals based on the information provided in a nutrition table. For one group, "the label 'fruit sugar' was used; for the other, the label 'sugar' was used. Results suggest[ed] that the phrase 'fruit sugar' listed as an ingredient of the breakfast cereal resulted in a more positive perception of the healthiness of the cereal compared with the ingredient labeled 'sugar.'"[60]

---

[56] Id. ("Some studies have found that even high school graduates and college students lack the basic health literacy skills to effectively apply nutrition label information[ ].").

[57] Alan S. Levy & Sara B. Fein, *Consumers' Ability to Perform Tasks Using Nutrition Labels*, J. Nutr. Educ. & Behav. (1998).

[58] Id.

[59] Id.

[60] Bernadette Sutterlin & Michael Siegrist, *Simply adding the word 'fruit' makes sugar healthier: The misleading effect of symbolic information on the perceived healthiness of food*, Appetite (Dec. 2015) ("The labeling of the ingredients by making use of symbolic information may, consequently, exert a misleading effect on a consumer's assessment of the

69.     A recent survey of 2,000 U.S. participants demonstrated that "[t]he American population fails very clearly to identify healthy products . . . ."[61] In the survey, each participant was shown a collection of cereal bars and asked to rank them from healthiest to least healthy. The products' health "rankings were based off of the A through E Nutri-score used to grade some food products in the UK," and ultimately, "only 9% of participants were able to correctly identify which product was the healthiest[.]"[62]

70.     "Even more worrying, 13 percent identified the least nutritious food option as the healthiest—more than the amount who properly identified the healthiest."[63] This was despite that "60% actively are seeking food and beverage products to support their overall health," demonstrating "widespread confusion when it comes to determining what is and isn't healthy."[64]

71.     Thus, although "Americans are often advised to eat healthier, more nutritious foods in an effort to stifle the diabetes and the obesity epidemic striking the nation[,]

---

product's healthiness. The findings suggest that the effect is quite robust. A more profound and comprehensive evaluation of the provided information (as occurs with people with pronounced health consciousness) does not protect against the misleading effect of symbolic information and does not add to judgment accuracy. This indicates that relying and drawing on the symbolic meaning of information is, to a certain extent, an automatic and implicit process that cannot easily be corrected by increasing people's health consciousness.").

[61] Mansur Shaheen, "Only 9% of Americans can properly read a nutrition label with many falling for misleading labels like 'whole grain' or 'fat free' on the front of packaging," *Daily Mail* (Apr. 15, 2022) [hereinafter "Shaheen, *nutrition label*"], *available at* https://www.dailymail.co.uk/health/article-10722517/Only-9-Americans-properly-read-nutrition-label.html.

[62] *Id.*

[63] *Id.*

[64] Sam Danley, "Study finds few consumers understand healthy food labels," *Supermarket Perimeter* (Mar. 16, 2022), *available at* https://www.supermarketperimeter.com/articles/7888-study-finds-few-consumers-understand-healthy-food-labels.

*Elders v. Ocean Spray Cranberries, Inc.*
CLASS ACTION COMPLAINT

[r]esearchers find that many cannot identify healthy foods in the grocery store aisle . . . ."[65] Instead, Americans were found to misidentify claims such as "whole grain" or "naturally flavored" as "markers that a food [is] healthy." These claims often "mislead people on what products are actually healthy for them," and "Americans' failure to identify healthy products is likely playing a role in the nation's budding obesity and diabetes epidemics."[66]

72. The survey also looked at the impact of "call[ing] out the amount of different nutrients in their products . . . on the front of their packages" while ***not*** "also call[ing] out the amount of potentially less desirable ingredients, like sugars, sweeteners, sodium or saturated fats."[67] It found "this kind of potentially selective attribute labeling . . . had the biggest sway in leading consumers to make incorrect health-related choices."[68]

73. Additionally, reading the Products' nutrition information is unlikely to sufficiently correct consumers' understanding of the healthfulness of the Products because the vast majority of consumers do not have the nutrition knowledge to accurately interpret the nutrition facts. In other words, "frequent use of nutrition labels does not promote understanding of [nutrient] levels."[69]

---

[65] Shaheen, *nutrition label*, *supra* n.61.

[66] *Id.*

[67] Megan Poinski, "Fewer than 1 in 10 consumers can make healthy choices from front-of-pack labeling, study finds," *Food Dive* (Mar. 15, 2022), *available at* https://www.fooddive.com/news/fewer-than-1-in-10-consumers-can-make-healthy-choices-from-front-of-pack-la/620293.

[68] *Id.*

[69] Lisa M. Soederberg Miller & Diana L. Cassady, *The effects of nutrition knowledge on food label use: A review of the literature*, APPETITE (2015) (citing Elizabeth Howlett et al., *How modification of the nutrition facts panel influences consumers at risk for heart disease: The case of trans fat*, J. PUB. POL. & MARKET. (2008)).

74.     A 2017 Shopper Trends Study by Label Insights found that "67% of consumers say it is challenging to determine whether a food product meets their [dietary] needs simply by looking at the package label[.]"[70]

75.     A 2021 survey found that "[c]onsumers perceive health differences even when two products have the same Nutrition Facts label" if there are packaging claims suggesting healthfulness.[71]

76.     In one survey, more than 3,000 U.S. adults viewed an ice cream nutrition label and then answered four questions that tested their ability to apply, understand, and interpret the nutrition information. Approximately 24% could not determine the calorie content of the full ice-cream container; 21% could not estimate the number of servings equal to 60g of carbohydrates; 42% could not estimate the effect on daily calorie intake of foregoing 1 serving; and 41% could not calculate the percentage daily value of calories in a single serving.[72] Only 53.9% of respondents who had earned a 4-year college degree could correctly answer all four nutrition label questions.[73]

77.     Recently, the FDA recognized that "many consumers would like to know how to use th[e] [Nutrition Facts] information more effectively and easily," and so published a guide on "How to Understand and Use the Nutrition Facts Label."[74] It took the FDA nearly

---

[70] "Study Shows Labeling Often Confuses Consumers," *Packaging Strategies* (Mar. 30, 2017) *available at* https://www.packagingstrategies.com/articles/94081-study-shows-labeling-often-confuses-consumers (citing Label Insight 2017 Shopper Trends Study).

[71] International Food Information Council, "2021 Food & Health Survey," at 31 (2021), *available at* https://foodinsight.org/wp-content/uploads/2021/05/IFIC-2021-Food-and-Health-Survey.May-2021-1.pdf.

[72] Persoskie et al., *US Consumers' Understanding*, *supra* n.55.

[73] *Id.*

[74] FDA, "How to Understand and Use the Nutrition Facts Label" (last updated Feb. 25, 2022), *available at* https://www.fda.gov/food/new-nutrition-facts-label/how-understand-and-use-nutrition-facts-label#top.

twelve pages to explain how to "make it easier for you to use the Nutrition Facts labels to make quick, informed food decisions to help you choose a healthy diet."

78.    The problem is so severe that the FDA created an entire "education campaign" designed to "help consumers, health care professionals, and educators learn how to use [the Nutrition Facts Label] as a tool for maintaining healthy dietary practice," recognizing the current widespread confusion, even among "health care professionals," in how to properly use the Nutrition Facts to make healthy choices.[75]

## IV.    THE PRODUCTS' LABELING VIOLATES STATE AND FEDERAL REGULATIONS

79.    The Products and their challenged labeling statements violate California Health and Safety Code §§ 109875, *et. seq.* (the "Sherman Law"), which has expressly adopted the federal food labeling requirements as its own. *See, e.g., id.* § 110100; *id.* § 110670 ("Any food is misbranded if its labeling does not conform with the requirements for nutrition labeling as set forth in Section 403(r) (21 U.S.C. Sec. 343(r)) of the federal act and the regulation adopted pursuant thereto.").

80.    First, the challenged claims are false and misleading for the reasons described herein, in violation of 21 U.S.C. § 343(a), which deems misbranded any food whose "label is false or misleading in any particular." Ocean Spray accordingly also violated California's parallel provision of the Sherman Law. *See* Cal. Health & Safety Code § 110670.

81.    Second, despite making the challenged claims, Ocean Spray "fail[ed] to reveal facts that are material in light of other representations made or suggested by the statement[s], word[s], design[s], device[s], or any combination thereof," in violation of 21 C.F.R. § 1.21(a)(1). Such facts include the detrimental health consequences of consuming the Products.

---

[75] *See* FDA, "The New Nutrition Facts Label—What's in it for you?" (last updated Apr. 13, 2022), *available at* https://www.fda.gov/food/nutrition-education-resources-materials/new-nutrition-facts-label.

82.    Third, Ocean Spray failed to reveal facts that were "[m]aterial with respect to the consequences which may result from use of the article under" both "[t]he conditions prescribed in such labeling," and "such conditions of use as are customary or usual," in violation of 21 C.F.R. § 1.21(a)(2)(ii). Namely, Ocean Spray failed to disclose the increased risk of serious chronic disease and death that is likely to result from consumption of the Products in the customary and prescribed manners.

## V.    PLAINTIFFS' PURCHASE, RELIANCE, AND INJURY

83.    Plaintiff Ann Elders purchased Craisins, usually the "Whole & Juicy" variety, several times throughout the past four years, typically from Costco in San Diego, California. Ms. Elders has also purchased Craisins at Walmart, Vons, and Ralphs in San Diego, California.

84.    When purchasing Craisins, Ms. Elders was seeking a nutritious, healthy food, that is, the type of food whose regular consumption would not likely increase the risk of disease. In purchasing Craisins, Ms. Elders was exposed to, read, and relied on Ocean Spray's health and wellness representations described herein, including the USDA MyPlate citations and infographic.

85.    Plaintiff Rebecca Crampton purchased Bites, usually in the "Greek Yogurt" variety, frequently throughout the past four years. She typically purchased Bites from Target stores, and sometimes Vons stores, in San Diego, California.

86.    When purchasing Bites, Ms. Crampton was seeking a nutritious, healthy food, that is, the type of food whose regular consumption would not likely increase the risk of disease. In purchasing Bites, Ms. Crampton was exposed to, read, and relied on Ocean Spray's health and wellness representations described herein, including that Bites are "a wholesome snack you can feel good about!" to "satisfy your sweet tooth."

87.    These claims, however, as well as Ocean Spray's omissions, were and are deceptive because the Products are not healthy, and instead contain such high levels of added sugar that their regular consumption is likely to increase the risk of chronic disease.

88.     Neither Plaintiff is a nutritionist, food expert, or food scientist. Rather, each is a lay consumer, like other average consumers, who did not have the specialized knowledge that Ocean Spray had regarding the nutritional composition of the Products. At the time of purchase, Plaintiffs were unaware of the extent to which consuming high amounts of added sugar adversely affects health or what amount of added sugar might have such an effect.

89.     Plaintiffs acted reasonably in relying on the challenged labeling claims, which Ocean Spray intentionally placed on the Products' labeling with the intent to induce average consumers into purchasing the Products. Plaintiffs were likewise induced to purchase the Products based on Ocean Spray's omissions and would have acted differently had Ocean Spray disclosed all material information.

90.     Plaintiffs would not have purchased the Products if they knew that the challenged labeling claims were false and misleading in that the Products are detrimental rather than beneficial to health.

91.     The Products cost more than similar products without misleading labeling and would have cost less absent Ocean Spray's false and misleading statements and omissions.

92.     Through the misleading labeling claims and omissions, Ocean Spray was able to gain a greater share of the market than it would have otherwise and was able to increase the size of the market.

93.     Plaintiffs paid more for the Products, and would only have been willing to pay less, or unwilling to purchase them at all, absent the false and misleading labeling complained of herein.

94.     Plaintiffs would not have purchased the Products if they had known they were misbranded pursuant to California and FDA regulations, or that the challenged claims were false or misleading.

95.     For these reasons, the Products were worth less than what Plaintiffs and the Class paid for them.

96.     Instead of receiving products that were healthy, Plaintiffs and the Class received products likely to increase risk of disease when consumed regularly.

97.     Plaintiffs and the Class lost money as a result of Ocean Spray's deceptive claims, omissions, and practices in that they did not receive what they paid for when purchasing the Products.

98.     Plaintiffs still wish to purchase healthy foods and continue to see the Products at stores when they shop. They would purchase the Products in the future if the Products were labeled truthfully, but unless Ocean Spray is enjoined in the manner Plaintiffs seek, they may not be able to rely on Ocean Spray's health and wellness claims in the future.

99.     Plaintiffs' substantive right to a marketplace free of fraud, where they are entitled to rely with confidence on representations such as those made by Ocean Spray, continues to be violated every time Plaintiffs are exposed to the misleading labeling claims.

100.    Plaintiffs' legal remedies are inadequate to prevent these future injuries.

## CLASS ACTION ALLEGATIONS

101.    While reserving the right to redefine or amend the class definition prior to or as part of a motion seeking class certification, pursuant to Federal Rule of Civil Procedure 23, Plaintiffs seek to represent a class of all persons the in United States, and separately a Subclass of all persons in California, who, at any time from four years prior to the date of filing of this Complaint to the time a class is notified (the "Class Period"), purchased, for personal or household use, and not for resale or distribution, any of the Products (the "Class" and "California Subclass," which is subsumed and included therein).

102.    The members in the proposed Class are so numerous that individual joinder of all members is impracticable, and the disposition of the claims of all Class Members in a single action will provide substantial benefits to the parties and Court.

103.    Questions of law and fact common to Plaintiffs and the Class include:

a.     whether Ocean Spray communicated a message regarding the healthfulness of the Products through their packaging and advertising;

b.     whether that message was material, or likely to be material, to a reasonable consumer;

*Elders v. Ocean Spray Cranberries, Inc.*
CLASS ACTION COMPLAINT

     c.     whether the challenged claims are false, misleading, or reasonably likely to deceive a reasonable consumer;

     d.     whether Ocean Spray's conduct is unfair or violates public policy;

     e.     whether Ocean Spray's conduct violates state or federal food statutes or regulations;

     f.     whether Ocean Spray made and breached warranties;

     g.     the proper amount of damages, including punitive damages;

     h.     the proper amount of restitution;

     i.     the proper scope of injunctive relief; and

     j.     the proper amount of attorneys' fees.

104. These common questions of law and fact predominate over questions that affect only individual Class Members.

105. Plaintiffs' claims are typical of Class Members' claims because they are based on the same underlying facts, events, and circumstances relating to Ocean Spray's conduct. Specifically, all Class Members, including Plaintiffs, were subjected to the same misleading and deceptive conduct when they purchased the Products and suffered economic injury because the Products are misrepresented. Absent Ocean Spray's business practice of deceptively and unlawfully labeling the Products, Plaintiffs and other Class Members would not have purchased them or would have paid less for them.

106. Plaintiffs will fairly and adequately represent and protect the interests of the Class, have no interests incompatible with the interests of the Class, and have retained counsel competent and experienced in class action litigation, and specifically in litigation involving the false and misleading advertising of foods and beverages.

107. Class treatment is superior to other options for resolution of the controversy because the relief sought for each Class Member is small, such that, absent representative litigation, it would be infeasible for Class Members to redress the wrongs done to them.

108. Ocean Spray has acted on grounds applicable to the Class, thereby making appropriate final injunctive and declaratory relief concerning the Class as a whole.

109.    As a result of the foregoing, class treatment is appropriate under Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3).

## CAUSES OF ACTION

### FIRST CAUSE OF ACTION

### Violations of the Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200 *et seq.*

### (On behalf of the California Subclass)

110.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

111.    The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200.

112.    The acts, omissions, misrepresentations, practices, and non-disclosures of as alleged herein constitute business acts and practices.

### Fraudulent

113.    A statement or practice is fraudulent under the UCL if it is likely to deceive a significant portion of the public, applying an objective reasonable consumer test.

114.    As set forth herein, the challenged labeling claims and omissions relating to the Products are likely to deceive reasonable consumers and the public.

### Unlawful

115.    The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

- The False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.*;
- The Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*;
- The Federal Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*; and
- The California Sherman Food, Drug, and Cosmetic Law, Cal. Health & Safety Code §§ 110100 *et seq.*

### Unfair

116.    Ocean Spray's conduct with respect to the labeling, advertising, and sale of the Products was unfair because Ocean Spray's conduct was immoral, unethical, unscrupulous,

30

or substantially injurious to consumers, and the utility of its conduct, if any, does not outweigh the gravity of the harm to its victims.

117.    Ocean Spray's conduct with respect to the labeling, advertising, and sale of the Products also was and is unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not necessarily limited to the False Advertising Law, portions of the Federal Food, Drug, and Cosmetic Act, and portions of the California Sherman Food, Drug, and Cosmetic Law.

118.    Ocean Spray's conduct with respect to the labeling, advertising, and sale of the Products also was and is unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one that consumers themselves could reasonably have avoided. Specifically, the increase in profits obtained by Ocean Spray through the misleading labeling does not outweigh the harm to Class Members who were deceived into purchasing the Products, believing they were healthy, when in fact they are likely to detriment health.

119.    Ocean Spray profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

120.    Plaintiffs and Class Members are likely to continue to be damaged by Ocean Spray's deceptive trade practices, because Ocean Spray continues to disseminate misleading information. Thus, injunctive relief enjoining Ocean Spray's deceptive practices is proper.

121.    Ocean Spray's conduct caused and continues to cause substantial injury to Plaintiffs and other Class Members. Plaintiffs have suffered injury in fact as a result of Ocean Spray's unlawful conduct.

122.    In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Ocean Spray from continuing to conduct business through unlawful, unfair, and/or fraudulent acts and practices, and to commence a corrective advertising campaign.

123.    Plaintiffs and the Class also seek an order for the restitution of all monies from the sale of the Products, which were unjustly acquired through acts of unlawful competition.

124.   Because Plaintiffs' claims under the "unfair" prong of the UCL sweep more broadly than their claims under the FAL, CLRA, or UCL's "fraudulent" prong, Plaintiffs' legal remedies are inadequate to fully compensate Plaintiffs for all of Ocean Spray's challenged behavior.

## SECOND CAUSE OF ACTION

**Violations of the False Advertising Law, Cal. Bus. & Prof. Code §§ 17500 *et seq.***
**(On behalf of the California Subclass)**

125.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

126.   The FAL provides that "[i]t is unlawful for any person, firm, corporation or association, or any employee thereof with intent directly or indirectly to dispose of real or personal property or to perform services" to disseminate any statement "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." Cal. Bus. & Prof. Code § 17500.

127.   It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id*.

128.   As alleged herein, the advertisements, labeling, policies, acts, and practices of Ocean Spray relating to the Products were likely to mislead consumers acting reasonably, as to the healthfulness of the Products.

129.   Plaintiffs suffered injury in fact as a result of Ocean Spray's actions as set forth herein because Plaintiffs purchased the Products in reliance on Ocean Spray's false and misleading marketing claims and omissions stating or suggesting that the Products are healthful and nutritious.

130.   Ocean Spray's business practices as alleged herein constitute unfair, deceptive, untrue, and misleading advertising pursuant to the FAL because Ocean Spray has advertised the Products in a manner that is untrue and misleading, which Ocean Spray knew or reasonably should have known, and omitted material information from the Products' labeling.

131.   Ocean Spray profited from the sale of the falsely and deceptively advertised Products to unwary consumers.

132.   As a result, Plaintiffs, the Class, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Ocean Spray was unjustly enriched.

133.   Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiffs, on behalf of themselves and the Class, seek an order enjoining Ocean Spray from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

134.   Because the Court has broad discretion to award restitution under the FAL and could, when assessing restitution under the FAL, apply a standard different than that applied to assessing damages under the CLRA or commercial code (for Plaintiffs' breach of warranty claims), and restitution is not limited to returning to Plaintiffs and class members monies in which they have an interest, but more broadly serves to deter the offender and others from future violations, the legal remedies available under the CLRA and commercial code are more limited than the equitable remedies available under the FAL, and are therefore inadequate.

## THIRD CAUSE OF ACTION

### Violations of the Consumers Legal Remedies Act, Cal. Civ. Code §§ 1750 *et seq.*
### (On behalf of the California Subclass)

135.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth fully herein.

136.   The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

137.   Ocean Spray's false and misleading labeling and other policies, acts, and practices were designed to, and did, induce the purchase of the Products for personal, family, or household use by Plaintiffs and Class Members, and violated and continue to violate the following sections of the CLRA:

a.     § 1770(a)(5): representing that goods have characteristics, uses, or benefits which they do not have;

b.     § 1770(a)(7): representing that goods are of a particular standard, quality, or grade if they are of another;

c.     § 1770(a)(9): advertising goods with intent not to sell them as advertised; and

d.     § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

138.   Ocean Spray profited from the sale of the falsely, deceptively, and unlawfully advertised Products to unwary consumers.

139.   Ocean Spray's wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

140.   Pursuant to California Civil Code § 1782, more than 30 days before filing this lawsuit, Plaintiffs sent to Ocean Spray by certified mail, return receipt requested, written notice of their claims and Ocean Spray's particular violations of the Act, but Ocean Spray has failed to implement remedial measures.

141.   As a result, Plaintiffs and the Class have suffered harm, and therefore seek actual damages resulting from purchases of the Products sold throughout the Class Period to all Class Members; punitive damages; injunctive relief in the form of modified advertising and a corrective advertising plan; restitution; and attorneys' fees and costs. *See* Cal. Civ. Code § 1782(d).

142.   In compliance with Cal. Civ. Code § 1780(d), an affidavit of venue is filed concurrently herewith.

### FOURTH CAUSE OF ACTION

### Breaches of Express Warranties, Cal. Com. Code § 2313(1)

### (On behalf of the California Subclass)

143.   Plaintiff Crampton realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

144.   Through the Bites' labeling, Ocean Spray made affirmations of fact or promises, or description of goods, that, *inter alia*, Bites are healthy. These affirmations and descriptions include "a wholesome snack you can feel good about!"

145.   These representations were part of the basis of the bargain in that Plaintiff Crampton and the Class purchased Bites in reasonable reliance on those statements. Cal. Com. Code § 2313(1).

146.   Ocean Spray breached its express warranties by selling products that, for the reasons described herein, do not meet the above affirmations, promises, and product descriptions.

147.   That breach actually and proximately caused injury in the form of the lost purchase price that Plaintiff Crampton and Class Members paid for the Bites.

148.   As a result, Plaintiff Crampton seeks on behalf of herself and other Class Members, actual damages arising as a result of Ocean Spray's breaches of express warranties, including, without limitation, expectation damages.

## FIFTH CAUSE OF ACTION

## Breach of Implied Warranty of Merchantability, Cal. Com. Code § 2314
### (On behalf of the California Subclass)

149.   Plaintiff Crampton realleges and incorporates the allegations elsewhere in the Complaint as if set forth fully herein.

150.   Ocean Spray, through its acts set forth herein, in the sale, marketing, and promotion of Bites bearing the statements "a wholesome snack you can feel good about!", made representations, that, *inter alia*, Bites are healthy.

151.   Ocean Spray is a merchant with respect to the goods of this kind which were sold to Plaintiff Crampton and the Class, and there were, in the sale to Plaintiff Crampton and the Class, implied warranties that those goods were merchantable.

152.   Ocean Spray breached that implied warranty because, for the reasons discussed herein, Bites are not wholesome and healthy.

153.   As an actual and proximate result of Ocean Spray's conduct, Plaintiff Crampton and the Class did not receive goods as impliedly warranted by Ocean Spray to be merchantable in that they did not conform to promises and affirmations made on the container or label of the goods.

154.   As a result, Plaintiff Crampton seeks actual damages, including, without limitation, expectation damages.

**SIXTH CAUSE OF ACTION**

**Negligent Misrepresentation**

**(On behalf of the Class)**

155.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

156.   As alleged above, Ocean Spray misrepresented the healthfulness of its Products and omitted that consuming the Products increases the risk of metabolic disease, cardiovascular disease, type 2 diabetes, and liver disease, and is further associated with increased all-cause mortality. These misrepresentations and omissions constituted a material fact in that a consumer's decision to purchase the Products would be influenced by the healthfulness of the Products.

157.   Ocean Spray's misrepresentations and omissions were made in the course of business transactions (the marketing, advertisement, sale, and purchase of the Products) in which both Plaintiffs and Ocean Spray have a pecuniary interest.

158.   Ocean Spray knew or should have known that these representations and omissions were false or misleading, and it failed to exercise reasonable care in disseminating its labels and in its marketing and advertising.

159.   Ocean Spray possesses superior knowledge regarding the detrimental health effects of consuming the Products. Such knowledge is not readily available to consumers like Plaintiffs and Class Members.

160.    Ocean Spray has a duty to consumers, like Plaintiffs and Class Members, not to provide them with false information when they make purchasing decisions regarding the Products.

161.    Ocean Spray holds itself out as an expert in nutrition and health science.

162.    Consumers lack nutritional science expertise that Ocean Spray possesses, and when Ocean Spray makes representations as to the healthfulness of its Products on its labels, consumers rely on Ocean Spray to provide truthful and complete information.

163.    Ocean Spray knew or should have known that Plaintiffs and other consumers rely on Ocean Spray's labeling and health representations, and that its representations and omissions induce consumers like Plaintiffs and Class Members into purchasing the Products.

164.    Plaintiffs' injuries were proximately caused by Ocean Spray's misrepresentations and omissions. Plaintiffs viewed Ocean Spray's labels prior to purchasing the Products, and the representations and omissions prompted them to purchase the Products. Had Plaintiffs been aware of Ocean Spray's misrepresentations and omissions, they would have been unwilling to purchase the Products, or to purchase them at the price that they paid.

165.    Ocean Spray's misrepresentations regarding the Products are material to a reasonable consumer because they relate to bodily health, and reasonable consumers would attach importance to such representations and omissions, which would influence their purchasing decision.

166.    Therefore, as a direct and proximate result of Ocean Spray's negligent misrepresentations, Plaintiffs and Class Members have suffered economic losses and other general and specific damages, in the amount of the Products' purchase price, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

*Elders v. Ocean Spray Cranberries, Inc.*
CLASS ACTION COMPLAINT

## SEVENTH CAUSE OF ACTION

### Intentional Misrepresentation

### (On behalf of the Class)

167.    Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if set forth in full herein.

168.    Ocean Spray marketed the Products in a manner conveying to reasonable consumers that the Products are healthy. Therefore, Ocean Spray has made misrepresentations about the healthfulness of the Products.

169.    Ocean Spray's misrepresentations regarding the Products are material to a reasonable consumer because they relate to bodily health. A reasonable consumer would attach importance to such representations and would be induced to act thereon in making purchasing decisions.

170.    At all relevant times, Ocean Spray knew that the misrepresentations were misleading, or has acted recklessly in making the misrepresentations, without regard to their truth.

171.    Ocean Spray intended that Plaintiffs and other consumers rely on these misrepresentations on the Products' packaging.

172.    Plaintiffs and the Class have reasonably and justifiably relied on Ocean Spray's intentional misrepresentations when purchasing the Products; had the correct facts been known, they would not have purchased the Products, or at least not at the prices at which the Products were offered.

173.    Therefore, as a direct and proximate result of Ocean Spray's intentional misrepresentations, Plaintiffs and Class Members have suffered economic losses and other general and specific damages, in the amount of the Products' purchase price, or some portion thereof, and any interest that would have accrued on those monies, all in an amount to be proven at trial.

## EIGHTH CAUSE OF ACTION

### Unjust Enrichment

### (On behalf of the Class)

174.   Plaintiffs reallege and incorporate the allegations elsewhere in the Complaint as if fully set forth herein.

175.   Plaintiffs and Class Members conferred upon Ocean Spray an economic benefit, in the form of profits resulting from the purchase and sale of the Products.

176.   Ocean Spray's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to Plaintiffs' and Class Members' purchases of the Products, and the economic benefits conferred on Ocean Spray are a direct and proximate result of its unlawful and inequitable conduct.

177.   It would be inequitable, unconscionable, and unjust for Ocean Spray to be permitted to retain these economic benefits because the benefits were procured as a direct and proximate result of its wrongful conduct.

178.   As a result, Plaintiffs and Class Members are entitled to equitable relief including restitution and/or disgorgement of all revenues, earnings, profits, compensation and benefits which may have been obtained by Ocean Spray as a result of such business practices.

## PRAYER FOR RELIEF

179.   Wherefore, Plaintiffs, on behalf of themselves, all others similarly situated, and the general public, pray for judgment against Ocean Spray as to each and every cause of action, and the following remedies:

a.   An Order declaring this action to be a proper class action, appointing Plaintiffs as Class Representatives, and appointing Plaintiffs' undersigned counsel as Class Counsel;

b.   An Order requiring Ocean Spray to bear the cost of Class Notice;

c.   An Order compelling Ocean Spray to conduct a corrective advertising campaign;

d.     An Order compelling Ocean Spray to destroy all misleading and deceptive advertising materials and product labels, and to recall all offending products;

e.     An Order requiring Ocean Spray to disgorge all monies, revenues, and profits obtained by means of any wrongful act or practice;

f.     An Order requiring Ocean Spray to pay restitution to restore all funds acquired by means of any act or practice declared by this Court to be an unlawful, unfair, or fraudulent business act or practice, or untrue or misleading advertising, plus pre-and post-judgment interest thereon;

g.     An Order requiring Ocean Spray to pay compensatory damages and punitive damages as permitted by law;

h.     An award of attorneys' fees and costs; and

i.     Any other and further relief that Court deems necessary, just, or proper.

### **JURY DEMAND**

180.   Plaintiffs hereby demand a trial by jury on all issues so triable.

Dated: March 25, 2024              /s/ Jack Fitzgerald

**FITZGERALD MONROE FLYNN PC**
JACK FITZGERALD
*jfitzgerald@fmfpc.com*
MELANIE R. MONROE
*mmonroe@fmfpc.com*
TREVOR FLYNN
*tflynn@fmfpc.com*
CAROLINE S. EMHARDT
*cemhardt@fmfpc.com*
2341 Jefferson Street, Suite 200
San Diego, California 92110
Phone: (619) 215-1741
***Counsel for Plaintiffs***

*Elders v. Ocean Spray Cranberries, Inc.*
Class Action Complaint